# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched or identify the* )<br>*person by name and address)* )<br> )<br>1) iPhone 8+ with IMEI 356775085820386; )<br>2) iPhone XS Max with IMEI 357273091005852; )<br>3) Tracfone with IMEI 015145000044525; )<br>4) Alctel with  IMEI 015552002219031 ) | Case No. 5:20-MJ-00299 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8 U.S.C. §§ 1324(a)(1)(A)(v)(I);<br>1324(a)(1)(A)(ii), (a)(1)(B)(i); and<br>1324(a)(1)(A)(iii), (a)(1)(B)(iii) | Conspiracy to Transport Illegal Aliens;<br>Transporting of Illegal Aliens for Private Financial<br>Gain; and Harboring of Illegal Aliens for Private<br>Financial Gain |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kimberly R. Christoff, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Riverside, CA</u>

Honorable Shashi H. Kewalramani, Magistrate Judge
*Printed name and title*

AUSA: Peter Dahlquist/re  (213) 453-8225

## <u>AFFIDAVIT</u>

I, Kimberly R. Christoff, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of an application for a warrant to search the following digital devices in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A:

      a.   a white iPhone 8+ with a black case, IMEI No. 356775085820386 ("SUBJECT DEVICE 1");

      b.   a rose gold iPhone XS Max with a pink flowered case, Model MT5F2LL/A, Serial No. F2Y542YKPHJ, IMEI No. 357273091005852 ("SUBJECT DEVICE 2");

      c.   a black Tracfone, Model TCL LX A502DL, IMEI No. 015145000044525 ("SUBJECT DEVICE 3"); and

      d.   a black Alctel, Model TCL 3V, IMEI No. 015552002219031 ("SUBJECT DEVICE 4") (collectively, the "SUBJECT DEVICES").

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens); 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting of Illegal Aliens for Private Financial Gain); and 1324(a)(1)(A)(iii), (a)(1)(B)(iii) (Harboring of Illegal Aliens for Private Financial Gain) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a graduate of the United States Border Patrol ("USBP") Academy and Federal Law Enforcement Training Center. As part of my training, I received criminal investigation training that included course studies in, among other things, criminal law, immigration law, constitutional law, search and seizures, and courtroom procedure.

5.    I am currently assigned to the Indio Border Patrol Station ("Indio Station") and I have been employed with USBP since January 10, 2008.  I am responsible for investigating, arresting, and facilitating the prosecution of alien smuggling organizations that use the Southern and Central Districts of California as an operational corridor.  I also investigate and arrest for violations of narcotic and bulk cash smuggling.

6.    During the course of my employment with USBP, I have participated in alien smuggling investigations that have resulted in federal criminal charges.  In connection with that work, I have made arrests, prepared reports in federal

proceedings, and provided sworn statements in federal criminal proceedings.  My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

7.    Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien smuggling organizations.  I also have gained extensive information regarding the normal operational habits of persons who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien smugglers to avoid detection and apprehension by law enforcement officers.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On the evening of Friday, May 29, 2020, Border Patrol agents arrested three individuals who were involved with smuggling four aliens.  One individual, Zina Victoria BRISENO ("BRISENO"), was in a transport vehicle along with the four undocumented aliens.  The other two individuals, Daniel PATRON ("PATRON") and Zayra Michelle SALAZAR-Castro ("SALAZAR"), were in a scout vehicle.  Officers identified both vehicles because both had traveled along the same, unusual, and extremely inefficient route that was consistent with routes smugglers use to avoid law enforcement detection.  Ultimately, officers arrested BRISENO, PATRON, and SALAZAR and seized the SUBJECT DEVICES.

9.   On May 31, 2020, the Honorable Shashi H. Kewalramani, United States Magistrate Judge, signed a criminal complaint charging PATRON, SALAZAR, and BRISENO with a single-count violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii)).   That complaint is attached as Exhibit 1 in support of an application for a warrant to search the SUBJECT DEVICES seized during the May 29, 2020 arrests of PATRON, SALAZAR, and BRISENO.   Exhibit 1 is incorporated herein by reference.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Seizure of SUBJECT DEVICE 1 and SUBJECT DEVICE 2

11.   As described in Exhibit 1, on the evening of May 29, 2020, officers began investigating a Chevrolet Silverado, bearing Arizona license plate CTM9261 ("Target Vehicle 2") as a scout vehicle for a red Toyota Corolla, bearing California license plate 8NBK766 ("Target Vehicle 1") that agents believed was transporting undocumented aliens.

12.   SBPA Saracco located Target Vehicle 2 at the ARCO gas station located directly off of I-10 at 20000 North Indian Canyon Drive, Desert Hot Springs, California. SBPA Saracco pulled up to Target Vehicle 2 and noticed a female sitting in the driver's seat, who was later identified as SALAZAR.   Upon seeing him, she immediately looked at her cellular phone

(SUBJECT DEVICE 2) that was in her hand and manipulating her phone in manner that led SBPA Saracco to conclude she was texting.  Moments later, a male (who was later identified as PATRON), exited the convenience store of the ARCO station. PATRON was carrying a cellular phone (SUBJECT DEVICE 1) in his hand which was later discovered to be turned completely off.

**B.   Seizure of SUBJECT DEVICE 3 and SUBJECT DEVICE 4**

13.   During the traffic stop of Target Vehicle 1, BPA Klatil encountered five persons, namely, the driver (BRISENO), the front passenger (Nasbit Yoselim GOMEZ-Mejia ("GOMEZ")), rear passengers (Jorge ORAZCO-Vasquez ("ORAZCO"), Martin PONCE DE LEON-Gonzalez ("PONCE") and Georgina RODRIGUEZ-Tavera ("RODRIGUEZ")).  BRISENO was arrested for alien smuggling. BRISENO, GOMEZ, ORAZCO, PONCE, and RODRIGUEZ were then transported to the Indio Station for further interview and processing.

14.   Border Patrol agents recovered five cellular phones inside of Target Vehicle 1, as follows:

a.   GOMEZ and ORAZCO shared a blue Motorola cellular phone which was located on the rear seat next to ORAZCO.

b.   RODRIGUEZ had a pink cellular phone which was located in the pocket of her camouflage backpack.

c.   PONCE had a small black cellular phone that was located in his left front pocket.

d.   BRISENO had the following two cellular phones (SUBJECT DEVICES 3 and 4), both of which were within reaching distance of BRISENO while she was driving Target Vehicle 1:

5

       i.   one phone with a cracked touchscreen located in a front-seat, pull-out compartment that was pulled out that was pulled out at the time of the arrest (SUBJECT DEVICE 3); and

       ii.  one large, black touchscreen phone that was located between the front seat on the shifter panel (SUBJECT DEVICE 4).

### V.  TRAINING AND EXPERIENCE ON ALIEN SMUGGLING

15.  Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations.  I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews.  I have become familiar with the methods of operation typically used by alien smugglers.  Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

       a.   Alien smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action.  Indeed, based on my training and experience, individuals who have established an income based on smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

       b.   Alien smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and

customers, regarding matters such as price, arrival time, and meet location.  This communication can occur by phone, text, email, or social media.  Alien smugglers maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the alien smuggling organization, as well as customers of the alien smuggling business.  Further, alien smugglers will also use text messages to send photographs as codes or actual pictures or videos.  I know that the above-described information can be stored on digital devices carried by alien smugglers.

   c. In addition, I know that professional smuggling operations depend upon maintaining both long-distance and local contacts with individuals in the source country who arrange the initial payment and embarkation, as well as those in the United States who facilitate arrival and collection of any remaining smuggling fees.  Smugglers often use fraudulent information to subscribe to cellular telephones, maintain separate customer and supplier telephones, and frequently change cellular telephones to thwart law enforcement efforts to intercept their communications.  Smugglers frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

   d. Individuals involved in human smuggling commonly obtain partial payment from customers prior to embarkation, and accept the remaining payment upon safe arrival in the United States.  Therefore, I am aware that individuals involved in human smuggling maintain books, customer lists, receipts, notes,

ledgers, and other records relating to the negotiated price for a customer and any partial payments made or due, and that such documents may be in code to attempt to thwart law enforcement detection.

e.   Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

f.   Alien smugglers frequently use Global Positioning System ("GPS") devices to navigate.  I know that GPS devices often store route history information of previously travelled routes.

g.   Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, e-mail and social media communications between the smugglers and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify embarkation and landing locations, meeting places, and smuggling routes; and identifying information about the smuggler and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

h.   Individuals engaged in alien smuggling often use multiple digital devices.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

16. As used herein, the term "digital device" includes the SUBJECT DEVICES.

17. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

9

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of
electronic evidence referenced above.

    b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    19.    The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

    a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

    b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) PATRON's, SALAZAR's or BRISENO's thumb- and/or fingers on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICES in front of PATRON's, SALAZAR's or BRISENO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VI. <u>CONCLUSION</u>

21.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2020.


_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (collectively, the "SUBJECT DEVICES"), seized on May 29, 2020 and currently maintained in the custody of United States Border Patrol in Indio, California:

1.    a white iPhone 8+ with a black case, IMEI No. 356775085820386 ("SUBJECT DEVICE 1");

2.    a rose gold iPhone XS Max with a pink flowered case, Model MT5F2LL/A, Serial No. F2Y542YKPHJ, IMEI No. 357273091005852 ("SUBJECT DEVICE 2");

3.    a black Tracfone, Model TCL LX A502DL, IMEI No. 015145000044525 ("SUBJECT DEVICE 3"); and

4.    a black Alctel, Model TCL 3V, IMEI No. 015552002219031 ("SUBJECT DEVICE 4").

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens); 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting of Illegal Aliens for Private Financial Gain); and 1324(a)(1)(A)(iii), (a)(1)(B)(iii) (Harboring of Illegal Aliens for Private Financial Gain) (the "Subject Offenses") (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which concern the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which concern the above-named violations;

       d.   Records, documents, programs, applications, materials concerning Daniel PATRON ("PATRON"), Zayra Michelle SALAZAR-Castro ("SALAZAR"), or Zina Victoria BRISENO's ("BRISENO")international border crossings;

       e.   Records, documents, programs, applications, materials, or conversations concerning the smuggling of persons, including ledgers, pay/owe records, lists of persons to be smuggled, correspondence, receipts, records, and documents noting price for smuggling, and/or times when smuggling events were conducted;

       f.   Audio recordings, pictures, video recordings, or still captured images concerning the smuggling or harboring of aliens;

       g.   Contents of any calendar or date book;

       h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations for the time period of April 29, 2020 to May 30, 2020; and

       i.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

       j.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.   In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress Daniel PATRON ("PATRON"), Zayra Michelle SALAZAR-Castro ("SALAZAR"), or Zina Victoria BRISENO ("BRISENO")'s thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of PATRON, SALAZAR, or BRISENO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Exhibit 1

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>
United States of America<br><br>
v.<br><br>
Daniel Patron,<br>
Zayra Michelle Salazar-Castro, and<br>
Zina Victoria Briseno,<br><br>
Defendants.
</td><td>
Case No.  2:20-mj-02484
</td></tr>
</table>

**FILED**
CLERK, U.S. DISTRICT COURT
06/01/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 29, 2020 in the county of Riverside in the Central District of California, the

defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(v)(I) | Conspiracy to Transport Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Pursuant to Fed R. Crim. P. 4.1
*Complainant's signature*

Kimberly R. Christoff, U.S. Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  May 31, 2020

*Judge's signature*

City and state:  Anaheim, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA Peter Dahlquist (213-453-8225)

**AFFIDAVIT**

I, Kimberly R. Christoff, being duly sworn, declare and state as follows:

**I. PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint charging Daniel PATRON ("PATRON"), Zayra Michelle SALAZAR-Castro ("SALAZAR"), and Zina Victoria BRISENO ("BRISENO") with a single-count violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii)).

2.    This affidavit is also made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation and detention of four material witnesses, each of whom are identified below, in connection with the criminal complaint against PATRON, SALAZAR, and BRISENO for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii)).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and material witness designation order and does not purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

**4.**   I am a graduate of the United States Border Patrol
("USBP") Academy and Federal Law Enforcement Training Center.
As part of my training, I received criminal investigation
training that included course studies in, among other things,
criminal law, immigration law, constitutional law, search and
seizures, and courtroom procedure.

**5.**   I am currently assigned to the Indio Border Patrol
Station ("Indio Station") and I have been employed with USBP
since January 10, 2008.  I am responsible for investigating,
arresting, and facilitating the prosecution of alien smuggling
organizations that use the Southern and Central Districts of
California as an operational corridor.  I also investigate and
arrest for violations of narcotic and bulk cash smuggling.

**6.**   During the course of my employment with USBP, I have
participated in alien smuggling investigations that have
resulted in federal criminal charges.  In connection with that
work, I have made arrests, prepared reports in federal
proceedings, and provided sworn statements in federal criminal
proceedings.  My work also has included speaking with suspects,
cooperating witnesses, and other law enforcement personnel
regarding the different methods by which the crime of alien
smuggling is committed.

7.    Through my experience, I have gained a working
knowledge and insight into the typical workings of criminal
alien smuggling organizations.  I also have gained extensive
information regarding the normal operational habits of persons
who make their living as alien smugglers, including the
behavior, speech, routes, and methods of operation of alien
smugglers to avoid detection and apprehension by law enforcement
officers.

### III. SUMMARY OF PROBABLE CAUSE

8.    On the evening of Friday, May 29, 2020, Border Patrol
agents arrested three individuals who were involved with
smuggling four aliens.  One individual, BRISENO, was in a
transport vehicle along with the four smuggled aliens.  The
other two individuals, PATRON and SALAZAR, were in a scout
vehicle.  Officers identified both vehicles because both had
traveled along the same, unusual, and extremely inefficient
travel pattern that was consistent with routes smugglers use to
avoid law enforcement detection.

9.    After identifying both vehicles, agents followed the
transport vehicle.  While following that vehicle, agents noticed
that vehicle slow to 10 miles per hour below the speed limit and
saw heads ducking in the back seat.  Agents also observed that
vehicle change lanes and move between semi-trucks in a manner
that agents believed, based on their experience, was a maneuver
to avoid observation.  Based on their observations, the
information about the transport vehicle's travel patterns, and

information about the transport vehicle, agents stopped the transport vehicle and found four undocumented aliens.

10.    After identifying the scout vehicle, agents followed it and observed it make an abrupt exit off the highway.  An agent later found the vehicle at a gas station and approached the driver and passenger.  When the agent approached, the agent noticed the passenger begin manipulating her cell phone and suspected the passenger was alerting the transport driver of the presence of law enforcement.  The agent talked with the two individuals, who said they were going shopping, which was implausible given their long and inefficient travel route.  The driver of the scout vehicle also stated he had been detained by immigration authorities before and that authorities seized $22,000 from him during that encounter.  In subsequent Mirandized interviews, both of these targets stated they were not shopping and admitted they were in a "scout vehicle" for alien smugglers.

11.    All four aliens being smuggled stated that they were aliens and that they had made arrangements to pay to be smuggled into the United States.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.** **Target Vehicle 1 and Target Vehicle 2 Flagged for Suspicious Travel Patterns and Characteristics**

    1.   Identification of Scout Vehicle (Target Vehicle 2)

    **13.**  Generally, a targeting analysis searches for vehicles that travel in a manner inconsistent with normal driving patterns of drivers in the area within similar time frames. When such a vehicle is identified, it is marked for surveillance and enforcement.

    **14.**  On Friday, May 29, 2020, at approximately 4:30 PM, Border Patrol Agent-Intelligence ("BPA-I") Daniel Beresiwsky was performing his duties at the San Diego Law Enforcement Coordination Center when he received an automated alert, via his government email, that a Chevrolet Silverado, bearing Arizona license plate CTM9261 ("Target Vehicle 2"), had just crossed through the westbound Interstate 10 (I-10") Agricultural Inspection Station in Blythe, California. Target Vehicle 2 was recently identified by BPA-I Matthew Bansen as being operated by a known alien smuggling facilitator, PATRON. Over the last two years, PATRON has been identified traveling in front of several vehicles that were later stopped in alien smuggling events. Based on these investigations, Border Patrol agents concluded that PATRON was traveling in front of vehicles in order to scout the operational status of Border Patrol checkpoints and identify any law enforcement presence along the route of travel, thus improving the odds of a successful smuggling event. Based on BPA-I Beresiwsky's knowledge, training, and experience, he knows that it is common practice for individuals involved in alien

smuggling activity driving this particular route to be traveling in tandem with other vehicles, which, in recent history, have been either also traveling with illicit cargo or operating as a "scout vehicle." The scout vehicle will tend to travel slightly ahead of the vehicle with illicit cargo and try to warn the smuggling vehicle of any law enforcement in the area.

        2.   <u>The PATRON Illicit Network</u>

15. PATRON is a part of an alien smuggling network that Border Patrol agents have identified as the PARTON Illicit Network (the "PATRON Network"). BP is investigating the PATRON Network for its direct links to bulk cash smuggling, alien smuggling, and weapons trafficking. The PATRON Network primarily operates in the San Diego, El Centro, and Yuma U.S. Border Patrol Sectors and in Mexico. The PATRON Network predominately coordinates and scouts for alien smuggling drivers originating from "stash" houses and commercial properties within the United States after illegal entry has occurred. People associated with the network scout routes of egress and Border Patrol checkpoints in order to identify any law enforcement presence and guide smugglers to their final destination. Communication between the coordinators, scouts, and drivers are primarily conducted through phone calls, text, Instant Messaging, and WhatsApp.

16. Drivers working for the PATRON Network are typically recruited from outside the inner network, thus making it difficult to connect the primary targets to the criminal activity.

17. Agents from Indio Station have had a minimum of 20 smuggling encounters and/or events that are linked to the PATRON Network since 2017.

### 3. Border Patrol Identifies Load Vehicle (Target Vehicle 1)

18. Based on this intelligence about PATRON and the PATRON Network, BPA-I Beresiwsky suspected that Target Vehicle 2 was traveling ahead of a smuggling vehicle in order to scout I-10 and the Agricultural Inspection Station for any Border Patrol or other law enforcement presence. So BPA-I Beresiwsky began to monitor the vehicles crossing through the inspection station behind Target Vehicle 2. At approximately 4:14 PM, a red Toyota Corolla, bearing California license plate 8NBK766 ("Target Vehicle 1"), crossed through the Blythe Agricultural Inspection Station. Target Vehicle 1 was also very distinct due to having after-market dark window tint on the driver and passenger side rear windows, a lighter after-market window tint on the driver side front window, and no tint on the front passenger side window and rear window. Record checks revealed that Target Vehicle 1 had traveled eastbound on Interstate 8 ("I-8"), through the El Centro and Yuma Border Patrol Sectors' area of responsibility before traveling westbound on I-10. Further checks revealed that Target Vehicle 1 did not cross through any of the Border Patrol checkpoints located in the area during the trip. This is significant in that most vehicles making this particular trip will have to cross through the Wellton Border Patrol Checkpoint located on the eastbound lanes of I-8 outside

of Yuma, Arizona.  In order to avoid inspection at the Wellton
Checkpoint, vehicles engaged in smuggling will often utilize
area farm roads to circumvent the checkpoint and inspection by
law enforcement.  Because Target Vehicle 1 had no history of
crossing through the Wellton Checkpoint, but had I-8 eastbound
travel on both the west and east side of the checkpoint, BPA-I
Beresiwsky suspected that it had likely utilized this smuggling
tactic.

19.  In addition, the fact that Target Vehicle 1 did not
cross through the Quartzsite Border Patrol checkpoint located on
Highway 95 ("Hwy 95") in order to reach I-10 was highly
suspicious.  This particular route offers the quickest and most
direct route of travel from I-8 to I-10.  Instead, Target
Vehicle 1 bypassed this route in order to travel eastbound on I-
8, towards Gila Bend, Arizona, and adding approximately two
hours of travel time to the trip.  This particular route of
travel has been identified as a popular circumvention route
utilized by smuggling organizations to bypass Border Patrol
checkpoints and deliver their illicit cargo to distribution hubs
in the counties of San Bernardino, Riverside and Los Angeles.
Over the last year, the Wellton, Blythe, and Indio Border Patrol
stations have investigated several alien smuggling events which
led to federal indictment where it was found that the smuggling
vehicle had taken, or had previously taken, this route of
travel.

4.   <u>Events of May 21, 2020: Target Vehicle 2</u>

**20.**   On May 21, 2020, at approximately 6:06 PM, Target
Vehicle 2 had also crossed through the westbound I-10 Blythe
Agricultural Inspection Station.  Shortly after, at
approximately 6:18 PM, a Dodge Caravan rental crossed through
the inspection station.  Records checks revealed that the
Caravan had traveled eastbound on I-8, through Arizona and
southeastern California before traveling westbound on I-10.
Just like Target Vehicle 1, the Caravan had not crossed through
the Wellton Border Patrol Checkpoint, despite having eastbound
I-8 travel on both the west and east sides of the checkpoint.  A
call to the rental agency revealed that the renter of the
vehicle was BRISENO, with an address of 1772 Morrison Street,
Pomona, California.  On May 23, 2020, the Caravan again traveled
eastbound I-8 through El Centro and Yuma's areas of
responsibility.  As before, the Caravan did not cross through
the Wellton Checkpoint, despite having I-8 travel on either
side.  Agents assigned to the Wellton Border Patrol Station
encountered the Caravan outside of Dateland, Arizona and
performed a vehicle stop and BRISENO, the renter of the Caravan,
who was found to be smuggling five undocumented persons.  After
that stop, BRISENO was released and Border Patrol continued its
investigation of the PATRON Network.

5.   <u>Further Investigation of Target Vehicle 1</u>

**21.**   Further record checks revealed that Target Vehicle 1
was registered to Javier BUENO at 1654 Elwood Street, Pomona,
California.  Over the last two weeks, BPA-I Beresiwsky has

identified three other vehicles registered out of Pomona, California that displayed the same travel pattern as Target Vehicle 1.  Checks also revealed that the registration had been suspended on February 10, 2020.  Alien smugglers often utilize vehicles with incomplete or suspended registrations.  This is done in order to distance the smuggling organization from any associations to the smuggling vehicles should they be interdicted by law enforcement.  Lastly, BPA-I Beresiwsky noticed that Target Vehicle 1 was 15 years old.  This fact is important because he knows from experience that smuggling organizations will often utilize older vehicles, in poor condition, to incur a minimal financial loss should the vehicle be seized by law enforcement.

**B.    Border Patrol Agents Suspect Target Vehicle 1 and Target Vehicle 2 are Being Used to Smuggle Aliens.**

22.   Based on Target Vehicle 1's travel on a known smuggling route, the lack of any crossing history though the Wellton Border Patrol Checkpoint, despite having traveled on either side, its crossing approximately 10 minutes behind Target Vehicle 2 at the Blythe Agricultural Inspection Station, and being registered out of Pomona, BPA-I Beresiwsky suspected that Target Vehicle 1 was engaged in an alien smuggling event and had taken an indirect route of travel to I-10 in order to circumvent established Border Patrol checkpoints.  He further suspected that Target Vehicle 2 was involved based on PARTON's history of travel ahead of vehicles later interdicted in alien smuggling events, including the Caravan from May 21, 2020, which had

displayed the same route of travel as Target Vehicle 1 and had
also crossed through the Blythe Agricultural Inspection Station
approximately 10 minutes behind Target Vehicle 2.  Therefore, on
May 29, 2020, at approximately 4:20 PM, BPA-I Beresiwsky
contacted Supervisory Border Patrol Agent ("SBPA") Daniel
Brightman of the Indio Station and provided him with the
information of Target Vehicles 1 and 2, travel patterns, his
suspicions, as well as the locations and direction of travel of
both Target Vehicles 1 and 2.

23.   After SBPA Brightman spoke with BPA-I Beresiwsky, SBPA
D. Brightman informed Indio Border Patrol Agents of the
suspicious travel pattern of Target Vehicles 1 and 2.  Agents
began to monitor vehicle traffic traveling westbound I-10 in an
effort to identify Target Vehicles 1 and 2.

**C.   Agents Encounter Occupants of Target Vehicle 2 at Gas
Station**

24.   Border Patrol Agents Stephen Klatil and Hector
Casteneda were assigned to roving patrol on Hwy 86 near Salton
City, California when they received notification of the lookout
on Target Vehicles 1 and 2 at approximately 4:26 PM.  At that
time, it was last determined for Target Vehicle 1 to be located
at or near Blythe, California.

25.   At approximately 5:19 PM, Agents Klatil and Casteneda
were positioned to observe westbound I-10 traffic.  At that
time, the Agents saw a 2020 gray Chevrolet Silverado matching
the lookout description for a possible scout vehicle (Target
Vehicle 2) pass their location.  SBPA John Saracco and BPA Hugo

Martinez also identified Target Vehicle 2 and began to following at a safe distance in order to further observe the occupants. SBPA Saracco verified the license plate to match the license plate of Target Vehicle 2.

26.  At approximately 5:45 PM, Target Vehicle 2 was driving in the fast lane and then rapidly changed lanes and abruptly exited on Indian Canyon Drive near Palm Springs, California.  At that point, BPA Martinez was not able to safely exit the interstate to continue following Target Vehicle 2.  BPA Martinez advised SBPA Saracco via the service radio of the situation. SBPA Saracco acknowledged; he was able to exit I-10 at the Indian Canyon Drive exit in Palm Springs, California in order to continue surveillance of Target Vehicle 2.

27.  SBPA Saracco positioned himself in a fully-marked Border Patrol vehicle at the intersection of I-10 and Dillon Road in Indio, California.  At approximately 5:19 PM, a newer model gray Chevrolet Silverado passed his location.  The vehicle appeared to match the lookout for Target Vehicle 2.  SBPA Saracco planned to perform a vehicle stop on Target Vehicle 2 with the hope that the occupants would immediately communicate to the driver of Target Vehicle 1 that Border Patrol Agents were in the area.  At that point, SBPA Saracco expected Target Vehicle 1 to take evasive measures in order to avoid detection. At that point, agents following Target Vehicle 1 would know that the two vehicles were traveling in tandem.  At approximately 5:45 PM, BPA Klatil stated over the radio that they had found Target Vehicle 1.  SBPA Saracco then stated on the radio that he

was going to attempt to re-establish contact with Target Vehicle 2.  SBPA Saracco then pulled back onto I-10 westbound and exited at the Indian Canyon Drive exit near Palm Springs, CA.  Within minutes, SBPA Saracco located Target Vehicle 2 at the ARCO gas station located directly off of I-10 at 20000 North Indian Canyon Drive, Desert Hot Springs, California.

28.  SBPA Saracco pulled up to Target Vehicle 2 and noticed a female sitting in the driver's seat, who was later identified as SALAZAR.  Upon seeing SBPA Saracco, who was in a Border Patrol uniform and in a fully marked Border Patrol service vehicle with lights and siren, which were not activated at the time.  SALAZAR immediately looked at her cellular phone that was in her hand and began touching the phone in a manner that led SBPA Saracco to believe she was texting.  SBPA Saracco suspected SALAZAR was alerting Target Vehicle 1 to the presence of Border Patrol.  Moments later, a male, later identified as PATRON, walked out of the convenience store of the ARCO station.  PATRON was carrying a cellular phone in his hand which was later discovered to be turned off.  SBPA Saracco identified himself as a Border Patrol Agent.  SBPA Saracco asked PATRON and SALAZAR the purpose of their travels.  They both told him that they were traveling to the Cabazon outlet mall in order to shop for household items.  SBPA Saracco thought that was odd because he suspected Cabazon outlets was not fully open due to COVID-19 restrictions.[1]  SBPA Saracco then asked both PATRON and SALAZAR

---

[1] According to the Cabazon outlets website, only a few of Cabazon outlet stores are open due to COVID-19 restrictions.

if they were United States citizens.  Both replied that they
were.  SBPA Saracco knew PATRON was the same PATRON who had been
linked to 20 smuggling encounters and/or events since 2017.  At
that point, SBPA Saracco noticed that they had an infant with
them inside Target Vehicle 2.  SBPA Saracco knows that sometimes
alien smugglers will bring minor children, companions, or pets
with them when they are engaging in smuggling.  By doing so,
smugglers may be attempting to appear less suspicious.  Also,
smugglers know that not all smuggling events result in arrests
and know that smugglers who have minor children or pets with
them are less likely to be arrested.

   **29.**  SBPA Saracco asked PATRON if he had ever been arrested
before.  PATRON stated he had been detained by immigration
authorities and they seized $22,000 from him.  While SBPA
Saracco was interacting with PATRON and SALAZAR, BPA Klatil and
Castaneda reported that they had stopped Target Vehicle 1 and
verified that, as discussed further below, Target Vehicle 1 was
carrying undocumented aliens.  After learning that Target
Vehicle 1 was smuggling aliens, for safety from the heat and
traffic, due to the presence of the infant, and the Indio
Station being only around a 15-minute drive away, SBPA Saracco
told PATRON and SALAZAR that they were being detained and asked
them to go with him to the Indio Station.  PATRON agreed to
travel to the Indio Station in SBPA Saracco's service vehicle
while SALAZAR followed behind in Target Vehicle 2.

**D. Agents Stop Target Vehicle 1 After Observing Passengers Ducking and Arrest BRISENO**

1. Observation of Target Vehicle 1

30. At approximately 5:48 PM, BPAs Klatil and Castaneda observed a maroon Toyota Corolla traveling westbound I-10 and matching the lookout description for the possible smuggling vehicle pass their location. BPAs Klatil and Casteneda entered onto I-10 via the Dillon Road on ramp in Indio, California. They were able to catch up to the Toyota Corolla (Target Vehicle 1) approximately two miles south of the Golf Center Parkway exit off of I-10 in Indio, California. As they approached, Target Vehicle 1 noticeably slowed from around the speed limit of 70 miles per hour to about 60 miles per hour. The agents also noted that the window tint matched the lookout description. The agents were not able to effectively view into the side rear windows due to the dark window tint. The female driver (BRISENO) and female front passenger (Nasbit Yoselim GOMEZ-Mejia, later determined to be a smuggled alien) were also noticeably rigid in posture by staring straight ahead while the agents were driving alongside Target Vehicle 1. Agents noted that record checks revealed the registered owner to come back to a "Javier Bueno." Because the officers perceived that the driver and passenger were both females and believed "Javier Bueno" to be a male name, they believed that the registered owner was neither the driver nor the passenger. Abruptly changing speed, rigid posture, and appearing to purposely ignore law enforcement presence are indicative of nervous behavior and

consistent with the nervousness displayed by subjects who are engaged in illicit activity.

31.   Agents Klatil and Castaneda slowed down their service vehicle and continued to follow Target Vehicle 1.   Target Vehicle 1 continued to drive around 60 miles per hour, but with more erratic driving behavior by changing lanes between semi-trucks between the slow and middle lanes of I-10.   This is a common tactic used by subjects engaged in illicit activity in order to evade law enforcement.   Doing so prevents agents from easily observing a vehicle and the occupants.

32.   Since the rear window of Target Vehicle 1 was not tinted, Agents Klatil and Castaneda were able to see into the rear seat through that window.   The agents saw bobbing heads of hair of the passengers who were not seated upright.   The movement was brief, but the agents believed that there could possibly be more people attempting to conceal themselves in the rear seat.   Through BPA Klatil and Castaneda's training and experience as Border Patrol Agents, they are aware that smugglers commonly use this tactic in an attempt to conceal the true and correct number of passengers in a vehicle.   Smugglers use this tactic to try to avoid arousing suspicion of any law enforcement that may be in the area.   It is also common for alien smugglers to coach illegal aliens in what to do or say while being smuggled.   An example of one such coaching command would be to lie down in the back seat or a cargo area.

33.   The agents also saw several air fresheners hanging along the rear windows on each side of the vehicle.   In their

experience, the air fresheners are significant because it is
typical for alien smugglers to hang them all over their vehicle
in an attempt to mask the strong body odor of people who have
journeyed for several days without adequate body hygiene.  This
is especially true in the heat and if undocumented persons
needed to walk through the desert for several miles before being
transported.

34.   In addition, Target Vehicle 1 is an older model
vehicle but with a newer license plate.  For example, the
California license plate, being a newer plate, starts with the
number eight.  This is significant because smugglers re-register
older vehicles in order to mask or hide any derogatory
information that may have existed under the previous license
plate.

2.   Agents Pull Over Target Vehicle 1

35.   Based upon these observations, along with the fact
that the vehicle had been traveling in a hours-long loop
utilizing major highways that approach and then leave the United
States/Mexico International border region within that timeframe,
the agents decided to initiate a traffic stop on Target Vehicle
1 by activating their lights and siren.  At the time of the
initiated traffic stop, approximately 6:00 PM, Target Vehicle 1
was in the middle lane and changed lanes to the slow lane and
reduced speed, but continued to drive for roughly another two to
three miles until finally yielding.  Target Vehicle 1 yielded
approximately one mile east of the Date Palm exit on I-10 near
Cathedral City, California.

36.   BPA Klatil approached Target Vehicle 1 from the rear on the passenger side, and asked the driver, who was later identified as BRISENO, to lower the front passenger window.  BPA Castaneda remained in the fully marked service vehicle in order to finish record checks.  BPA Klatil identified himself as a Border Patrol Agent; he was in full uniform.  He asked BRISENO to turn off the vehicle and she complied.  During the initial interview, BRISENO refused to answer questions.  Agent Klatil asked her from where she was traveling, to which she asked why he wanted to know and said that she did not do anything wrong. Agent Klatil spoke to BRISENO in English.  Agent Klatil then asked where she was going, BRISENO again asked why he needed to know.  BRISENO asked Agent Klatil why she was being stopped.  At this time, the Agents could see between the seats of the vehicle that there were at least three people attempting to conceal themselves by crouching low towards the floor boards.  BPA Klatil asked BRISENO to lower the rear window, at which point, she became confrontational and refused to comply.  BPA Klatil asked BRISENO how many people were in the rear seat of the vehicle and she replied that there were three people.  BPA Klatil again asked BRISENO to lower the rear window, in order to question the three people as to their citizenship and immigration status.  BRISENO refused and stated she "knows her rights!"  BPA Klatil then walked around to the driver side of the vehicle and asked BRISENO to step out of the vehicle. BRISENO complied while stating that she was not doing anything wrong and she was just giving the four people a ride.  At that

time, I informed BRISENO that she was being detained on
suspicion of alien smuggling, and that he was going to place her
inside of his service vehicle while they spoke to the passengers
of the vehicle.

      3.   Roadside Questioning of the Passengers of Target
Vehicle 1

37.   BPA Klatil then approached the front passenger, who
was later identified as GOMEZ-Mejia, Nasbit Yoselim ("GOMEZ"),
and questioned her as to her citizenship.  GOMEZ admitted to
being born in Mexico, to being a citizen of Mexico, and to not
possessing any documents to legally live, work or otherwise
remain in the United States.

38.   BPA Klatil then questioned the three rear passengers,
who were later identified as ORAZCO-Vasquez, Jorge ("ORAZCO"),
PONCE DE LEON-Gonzalez, Martin ("PONCE"), and RODRIGUEZ-Tavera,
Georgina ("RODRIGUEZ"), as to their citizenship.  Each rear
passenger admitted to being born in Mexico, to being a citizen
of Mexico, and to not possessing any documents to legally live,
work or otherwise remain in the United States.  BPA Cataneda
noticed that none of the passengers in the rear seats had their
safety belts on due to bending over and trying to conceal
themselves.

39.   At this time, BPA Klatil informed BRISENO that she was
under arrest for alien smuggling.  BRISENO, RODRIGUEZ, GOMEZ,
ORAZCO, and PONCE were then transported to the Indio Station for
further interview and processing.

40. There were five cellular phones located inside of Target Vehicle 1. BRISENO has two cellular phones: one large, black touchscreen phone that was located between the front seat on the shifter panel and one phone that was a cracked touchscreen located in a pull out compartment that was pulled out. GOMEZ and ORAZCO shared a blue Motorola cellular phone which was located on the rear seat next to ORAZCO. RODRIGUEZ had a pink cellular phone which was located in the pocket of her camouflage backpack. PONCE has a small black cellular phone with buttons that was located in his left front pocket.

**E.    Border Patrol Agents interview PATRON and SALAZAR**

1.    <u>PATRON Stated he acted as "Lookout" for Financial Gain in Mirandized Interview</u>

41. On Friday, May 29, 2020, at approximately 11:17 PM, BPA-I Ryan Tidd, BPA Joel Rosa, and BPA Alex Vera read PATRON his <u>Miranda</u> rights in English. PATRON indicated that he understood his rights and that he was willing to speak with them. Much of the interview was in English, but at times, PATRON and the agents spoke in Spanish.

42. PATRON stated that he lives at a particular address in San Luis, Arizona with his wife Karina Vera. PATRON stated that he is currently unemployed due to the Coronavirus, but he usually works at a potato processing facility in San Luis, Arizona. PATRON stated that he has had a few encounters with Border Patrol before, specifically when he and SALAZAR were arrested for transporting $22,000 on I-8 near San Diego, California a few years ago.

**43.**   Initially, PATRON claimed that he and his girlfriend, SALAZAR, along with their five month old daughter, were traveling to the Cabazon Outlets in order to look for household furnishings.  When asked about the specifics of the trip and why he chose the route of travel he did, PATRON admitted he had been operating as a "lookout" for alien smugglers.

**44.**   PATRON claimed that last week he was at a party in Mexico, where he met a man named "Caesar."  The two of them began to talk, and Caesar eventually told PATRON that if he was ever in need of quick money to contact his friend "Jorge." PATRON decided to call Jorge a few days ago and inquire about the offer Caesar had made.  Jorge told PATRON that he needed someone to drive a short distance ahead of vehicle that contained an unknown number of undocumented persons, acting as a "lookout" for Border Patrol and other law enforcement on the highway.

**45.**   PATRON accepted the offer from Jorge and he was told to be ready this afternoon.  At approximately 2:00 PM, PATRON left his home and drove to SALAZAR's residence in order to pick up her and their daughter.  PATRON was instructed by Jorge via a phone call to take Hwy 95 towards Quartzsite, Arizona and to notify him if he saw any law enforcement along the way.  Once In Quartzsite, Arizona, PATRON stopped at a Love's travel center and put gas in his truck and bought refreshments for the rest of the trip.  PATRON claims he had no contact with any other involved parties at the Love's.

46.   Once PATRON and SALAZAR were finished at the Love's, they were instructed by Jorge to take I-10 westbound towards Cabazon, California, which he believes was the final destination.   PATRON stated that after he completed the job today, he was going to be paid $500 by an unknown man in Mexico.

47.   PATRON stated the truck he was driving today is his, but he registered it in his mother's name.   He stated this is the first time he had been involved with smuggling illegal aliens.

2.   SALAZAR Stated PATRON Was a "Lookout" for Alien Smugglers and SALAZAR's Phone Had Messages with BRISENO About Buying Gas

48.   On Wednesday, May 29, 2020, at approximately 10:04 PM, BPA R. Tidd, BPA J. Rosa, and BPA Alex Vera read SALAZAR her Miranda rights in Spanish.   SALAZAR indicated that she understood her rights and she was willing to speak to the agents.   Most of the interview was in Spanish, but at times, SALAZAR and the agents spoke in English.

49.   SALAZAR initially stated that she and PATRON, her boyfriend, were on their way to the Cabazon Outlets in Cabazon, California to shop.   When the agents asked SALAZAR about her route of travel and as to why she took a much longer route, she stated that the GPS on her phone took her that direction.   When certain discrepancies in her story were brought to her attention, SALAZAR admitted she was working as a "lookout" for alien smugglers.

50.   SALAZAR stated that PATRON arrived at her house in San Luis, Arizona at approximately 2:00 PM that day.   PATRON told

SALAZAR that he was going to be a "lookout" for a vehicle smuggling aliens.  SALAZAR stated that they received instructions to drive up Hwy 95 towards Quartzsite, Arizona. SALAZAR stated that from Quartzsite, they were instructed to drive towards Cabazon, California.  SALAZAR stated that they were told to keep an eye out for any law enforcement along the way.  SALAZAR also gave verbal and written consent to search her personal cell phone.  Text messages revealed that they had stopped at a Love's service station at one point and had purchased fuel for a female (BRISENO) who was smuggling the illegal aliens on this event.  SALAZAR confirmed that they had stopped at Love's and bought gas for BRISENO.

    51.  SALAZAR stated that PATRON had been a "lookout" for smuggling drivers before, but that he had driven to the Fontana, California area.  SALAZAR claimed she did not know the amount of money he was going to receive if they were successful.

    **F.    Border Patrol Agents interview the smuggled aliens, namely, RODRIGUEZ, ORAZCO, GOMEZ, and PONCE.**

    52.  Border Patrol agents interviewed the foreign nationals and proposed material witnesses.  Throughout the interviews, agents used the same three photographic lineups when asking the witnesses to identify their transporters.

        a.    The photo line-up labeled 1A depicted PATRON in photograph no. 1.

        b.    The photo line-up labeled 2B depicted SALAZAR in photograph no. 1.

       c.    The phot line-up labeled 3C depicted BRISENO in photograph no. 4.

53.  As more fully set forth below, each witness gave information about how they came into the United States and who transported them.  Accordingly, based upon my experience and training, I believe that the testimony of RODRIGUEZ, ORAZCO, GOMEZ, and PONCE is required to establish that: (1) each had entered into, and remained within the United States unlawfully; (2) each were assisted by others, including the defendants, in seeking to enter the United States unlawfully and be transported therein once across the border; (3) they paid or were going to pay money for the service of being smuggled across the United States/Mexico border and be provided transportation within the United States subsequent to their illegal entry; (4) defendant BRISENO provided them transportation within the United States; and (5) defendants were aware of their status as unlawful aliens within the United States.

       1.   <u>Material Witness 1: RODRIGUEZ</u>

54.  At approximately 5:29 a.m. on May 30, 2020, RODRIGUEZ was placed under oath and was willing to give a sworn statement to the agents.  The sworn statement was conducted in Spanish.  Below is a summary of the information RODRIGUEZ provided.

55.  The subject stated that her name is Georgina RODRIGUEZ-Tavera, she was born in Jalisco, Mexico, and she is a citizen of Mexico.  RODRIGUEZ has never had any immigration documents that would allow her to be in the United States

legally.  RODRIGUEZ crossed the border Wednesday morning, May
27, 2020, in the desert outside of Mexicali, Mexico.

56.   RODRIGUEZ left her home in Tijuana, Mexico on
Wednesday, May 26, 2020.  RODRIGUEZ's friend drove her to
Mexicali, Mexico where her friend dropped her off at a bus
station.  Once at the bus station, an unknown female picked her
up and took her to a stash house in Mexicali, Mexico.  RODRIGUEZ
stayed at the house until May 27, 2020.  On that date, RODRIGUEZ
was taken to the border with three other undocumented
aliens.  The three undocumented aliens were the same people she
was arrested with.  At approximately 6:00 AM, RODRIGUEZ and the
group climbed the international border fence.  Once they climbed
over the border fence, they swam across a canal and then walked
through the desert until they reached a road.  RODRIGUEZ stated
that a sedan then picked them up and drove them to a house in an
unknown location. RODRIGUEZ stated that there was an unknown
male at the house who would feed them.

57.   On Friday, May 29, 2020, RODRIGUEZ and the three other
undocumented aliens were picked up by a white Dodge sedan and
driven to a Wal-Mart parking lot.  RODRIGUEZ stated that they
waited in the Dodge sedan until a red sedan driven by a female
subject (BRISENO) approached them.  RODRIGUEZ stated that the
female driver of the red sedan told them not to move and to
place the bags in the car on top of them so that they would not
be seen.  RODRIGUEZ stated that the red sedan was the same red
sedan they were arrested in and the female driver was the same
person who was arrested.

58.  RODRIGUEZ stated that they only stopped to get gas from the time they were picked up by the red sedan before being stopped and arrested.

59.  RODRIGUEZ stated that she was going to pay $10,000 upon arrival of her intended destination of Williams, California.

60.  RODRIGUEZ was shown a six-pack photo line-up labeled 1A and she was unable to identify anyone in the photographs.

61.  RODRIGUEZ was shown a six-pack photo line-up labeled 2B and she was unable to identify anyone in the photographs.

62.  RODRIGUEZ was shown a six-pack photo line-up labeled 3C and identified the subject in photograph no. 4 (BRISENO) as the driver of the vehicle in which she was arrested.

2.  Material Witness 2: ORAZCO

63.  At approximately 2:45 a.m. on Saturday, May 30, 2020, ORAZCO was placed under oath and was willing to give a sworn statement to the agents.  The sworn statement was conducted in Spanish.  Below is a summary of the information ORAZCO provided.

64.  The subject stated that his name is Jorge ORAZCO-Vazquez, he was born in Nayarit, Mexico, and he is a citizen of Mexico.  ORAZCO has never had any immigration documents that would allow him to be in the United States legally.  ORAZCO crossed the border Wednesday morning, May 27, 2020, in the desert outside of Mexicali, Mexico.

65.  ORAZCO left his home in Nayarit, Mexico on Tuesday, May 19, 2020.  ORAZCO stated that a family member drove him to Mexicali, Mexico.  ORAZCO stated that once he arrived in

Mexicali, Mexico, he met up with a driver who works with a smuggler that he had previously made arrangements with. ORAZCO stated that the driver then took him to a stash house. ORAZCO stated that he stayed at the house until May 27, 2020. ORAZCO stated that on that date he was taken to the international border with approximately 11 other subjects who were ready to illegally cross the international boundary fence.

66. At approximately 6:00 AM, ORAZCO and the group climbed the international border fence. Once they climbed over the border fence they had to swim across a canal and then walk through the desert until they reached a road. ORAZCO stated that a black Chevy Silverado picked them up and drove them to a house in Calexico, California. ORAZCO stated that he stayed at the house for approximately two days.

67. On Friday, May 29, 2020, ORAZCO and three other undocumented aliens were picked up by the same driver who picked him up approximately two days earlier. ORAZCO stated that he and other undocumented aliens were dropped off on the side of an unknown road. ORAZCO stated that almost immediately after being dropped off, a red Toyota sedan driven by a female stopped and picked them up. ORAZCO stated that it was the same female driver and red Toyota sedan that he was arrested in later that day. ORAZCO stated that the female driver of the red sedan told them to duck down. ORAZCO stated that they drove for approximately one hour and stopped to get gas. ORAZCO stated that they drove for approximately two more hours and stopped for gas again before being stopped and arrested. ORAZCO stated that

while they were being pulled over, the driver instructed them to stay hidden in the rear of the car.  ORAZCO stated that he thought she did this because she knew they were all undocumented aliens.

**68.**  ORAZCO stated that he was going to pay $10,000 upon arrival of his intended destination of San Diego, California.

**69.**  ORAZCO was shown a six-pack photo line-up labeled 1A and he was unable to identify anyone in the photographs.

**70.**  ORAZCO was shown a six-pack photo line-up labeled 2B and he was unable to identify anyone in the photographs.

**71.**  ORAZCO was shown a six-pack photo line-up labeled 3C and identified the subject in photograph no. 4 (BRISENO) as the driver of the vehicle in which he was arrested.

### 3.    Material Witness 3: GOMEZ

**72.**  At approximately 3:31 AM on Saturday, May 30, GOMEZ was placed under oath and was willing to give a sworn statement to the agents.  The sworn statement was conducted in Spanish.  Below is a summary of the information GOMEZ provided.

**73.**  The subject stated that her name is Nasbit GOMEZ-Mejia, she was born in Nayarit, Mexico, and she is a citizen of Mexico.  GOMEZ has never had any immigration documents that would allow her to be in the United States legally.  GOMEZ crossed the border Wednesday morning, May 27, 2020, in the desert outside of Mexicali, Mexico.

**74.**  GOMEZ left her home in Nayarit, Mexico on Tuesday, May 19, 2020.  GOMEZ stated that her mother drove her and her husband ORAZCO to Mexicali, Mexico.  GOMEZ stated that once she

arrived in Mexicali, Mexico, she met up with a driver who works
with a smuggler that her husband had previously made
arrangements with.  GOMEZ stated that the driver then took them
to a stash house.  GOMEZ stated that she stayed at the house
with her husband until May 27, 2020.  GOMEZ stated that on that
date she was taken to the international border fence with
approximately 15 other subjects who were ready to illegally
cross the international boundary fence.

**75.**  At approximately 6:00 AM, GOMEZ and the group climbed
the international border fence.  Once they climbed over the
border fence they had to swim across a canal and then walk
through the desert until they reached a road.  GOMEZ stated that
a white SUV picked them up and drove them to a house that took
about an hour to drive to.  GOMEZ stated that she stayed at the
house for approximately two days.  GOMEZ stated that there were
two male caretakers at the house.

**76.**  On Friday, May 29, 2020, GOMEZ and three other
undocumented aliens were transported to a shopping center
parking lot by one of the male caretakers in a white
sedan.  GOMEZ stated that almost immediately after being dropped
off, a red sedan driven by a heavy-set female with red hair and
glasses stopped and picked them up.  GOMEZ stated that it was
the same female driver that she was arrested with later that
day.

**77.**  GOMEZ stated that the female driver of the red sedan
told them to duck down and cover themselves with sweaters and
clothes.  GOMEZ stated that they drove for approximately two

hours and stopped to get gas, but they did not get gas because
the driver had no money.  GOMEZ stated that while at the gas
station, the driver continued to tell them all to stay
down.  GOMEZ stated that the driver asked her and the other
undocumented aliens if they had money to help put gas in the
car, but none of them did.  GOMEZ stated that they drove for
approximately two more hours and stopped for gas again.  GOMEZ
stated that this time the driver put gas in the car and while
she was pumping gas, she was on her cellphone. GOMEZ stated
after they left the gas station they drove for approximately two
hours before being stopped and arrested.

78.  GOMEZ stated that she was going to pay $10,000 upon
arrival of her intended destination of San Diego, California.

79.  GOMEZ was shown a six-pack photo line-up labeled 1A
and she was unable to identify anyone in the photographs.

80.  GOMEZ was shown a six-pack photo line-up labeled 2B
and she was unable to identify anyone in the photographs.

81.  GOMEZ was shown a six-pack photo line-up labeled 3C
and identified the subject in photograph no. 4 (BRISENO) as the
driver of the vehicle in which she was arrested.

4.   Material Witness 4: PONCE

82.  At approximately 4:39 AM on Saturday, May 30, 2020,
PONCE was placed under oath and was willing to give a sworn
statement to the agents.  The sworn statement was conducted in
Spanish.  Below is a summary of the information PONCE provided.

83.  The subject stated that his name is Martin PONCE DE
LEON-Gonzalez.  He was born in Michoacán, Mexico, and he is a

citizen of Mexico.   PONCE has never had any immigration
documents that would allow him to be in the United States
legally.   PONCE crossed the border Wednesday morning, May 27,
2020, in the desert outside of Mexicali, Mexico.

**84.**   PONCE left his home in Michoacán, Mexico on Sunday,
May 10, 2020.   PONCE stated that he took a bus to Mexicali,
Mexico.   PONCE stated that once he arrived in Mexicali, Mexico,
he met up with an unknown smuggler and afterwards a female
picked him up and took him to a stash house.   PONCE stated that
he stayed at the stash house until May 27, 2020.   PONCE stated
that on that date, he was taken to the international border
fence with approximately ten or eleven other subjects who were
ready to illegally cross the international boundary fence.

**85.**   At approximately 7:00 AM, PONCE and the group climbed
the international border fence.   Once they climbed over the
border fence they had to swim across a canal and then walk
through the desert until they reached a road.   PONCE stated that
a black SUV picked them up and drove them to a house in
Calexico, California.   PONCE stated that he stayed at the house
for approximately two days.   PONCE stated that a male subject
would come and go from the house and bring them food.

**86.**   On Friday, May 29, 2020, PONCE and three other
undocumented aliens were transported to a parking lot by the
male subject who would bring them food.   PONCE stated that a red
sedan pulled alongside the vehicle he was in and he was
instructed to get into that vehicle.   PONCE stated that the red
sedan was driven by a female subject and that once he got into

the vehicle that she told them to stay down and not to move.  PONCE stated that it was the same red sedan and the same female driver that he was arrested with later that day.

87.  PONCE stated that they drove for an extended amount of time then stopped to get gas.  PONCE stated that they continued to drive again before stopping at another gas station.  PONCE stated that the female driver was talking to them in English and he could not understand what she was saying.  PONCE stated that after driving for an unknown amount of time, they stopped at another gas station where the driver purchased something to drink.  PONCE stated that about 10 minutes after leaving the gas station they were all arrested.

88.  PONCE stated that he was going to pay $10,000 upon arrival of his intended destination of Los Angeles, California.

89.  PONCE was shown a six-pack photo line-up labeled 1A and he was unable to identify anyone in the photographs.

90.  PONCE was shown a six-pack photo line-up labeled 2B and he was unable to identify anyone in the photographs.

91.  PONCE was shown a six-pack photo line-up labeled 3C and identified the subject in photograph no. 4 (BRISENO) as the driver of the vehicle in which he was arrested.

///

///

## V.  CONCLUSION

92.  For all of the reasons described above, there is probable cause to believe that PATRON, SALAZAR and BRISENO have committed a violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy to Transport Illegal Aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii)).

93.  Finally, for all the reasons described above, there is sufficient facts to establish that the testimony of witnesses RODRIGUEZ, ORAZCO, GOMEZ, and PONCE are material in a criminal proceeding and that they should be designated and detained as material witnesses pursuant to 18 U.S.C. § 3144 (Release or detention of a material witness).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 31st day of May , 2020.

UNITED STATES MAGISTRATE JUDGE